UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>   Plaintiff,<br><br>   v.<br><br>CLINTON LEE HALBERT and<br>WRIGHT CHRISTOPHER HALBERT,<br><br>   Defendants. | NO. CR-09-0172-LRS-1<br>NO. CR-09-0172-LRS-2<br><br>**ORDER DENYING DEFENDANTS'**<br>**MOTION TO SUPPRESS AND FRANK'S**<br>**HEARING REQUEST** |

BEFORE THE COURT, at the scheduled pretrial conference on June 3, 2010, is Defendants' joint Motion to Suppress and Request for Frank's Hearing, Ct. Rec. 89, filed in NO. CR-09-0172-LRS-1 on May 17, 2010. Defendants, who were charged with Conspiracy to Manufacture a Controlled Substance, Manufacture of Marijuana, and Criminal Forfeiture, moved to suppress all evidence seized from Parcel #2378800[1] in Kettle Falls. The government opposes the motion. The Court took the motion under advisement at the June 3rd hearing. With the benefit of oral argument and

---

[1] Both Defendants' residences and suspected marijuana building/bunker were located on Parcel #2378800.

ORDER - 1

briefing from the government and Defendants, the Court hereby enters the following order.

**I. FACTUAL BACKGROUND**

On February 12, 2009, law enforcement officers executed a search warrant at the residence of Douglas Hatfield ("Hatfield") in Yakima, Washington. At that time, Special Agent Matthew Petty ("Agent Petty") of the Drug Enforcement Administration seized approximately 240 marijuana plants, drug ledgers, firearms, and other items related to a marijuana grow operation. Hatfield was subsequently placed under arrest and charged with manufacture and distribution of marijuana.

Agent Petty reviewed the seized drug ledgers and determined that Hatfield had been growing and trafficking marijuana for several years. Agent Petty found that one of the seized drug ledgers documented transactions with "Clint" and "Wright." The drug ledgers listed dealings Hatfield had with "Clint" and "Wright" over a period of approximately 9 months between May 2006 and January 2007. The drug ledgers appeared to show that Hatfield had purchased pound quantities of marijuana from "Clint" and/or "Wright" at $225.00 an ounce/$3,600.00 per pound and that the product was "permafrost" and "G-13."

Hatfield participated in several meetings in 2009 with Agent Petty after his arrest and discussed his marijuana grow operation. Hatfield stated that he had been in a romantic relationship with Perrieann Halbert ("Perrieann"), who was Clinton Halbert's ("Clinton") ex-wife. Hatfield

advised that Wright Halbert ("Wright") was Clinton and Perrieann's son. Hatfield advised that Clinton and Wright lived near Kettle Falls, Washington at a location he could provide after viewing an aerial map.

Hatfield further advised that in 2004, Wright traveled to Yakima to visit Perrieann. Hatfield stated that he observed Wright and his friends ingesting marijuana. According to Hatfield, Wright told Hatfield that he (Wright) was growing marijuana at his residence in the Kettle Falls area, and that he could supply Hatfield with marijuana. Hatfield advised that in approximately 2004, he and Perrieann traveled to Kettle Falls to visit Wright. According to Hatfield, within a year of meeting Wright, he (Hatfield) began purchasing marijuana from Wright. Hatfield also indicated that Clinton and Wright were neighbors and lived on a parcel next to the "China Bend Vineyard."

Hatfield further stated that between 2004-2006, he traveled to Wright's residence in Kettle Falls and purchased marijuana on numerous occasions. Hatfield described the interior and exterior of Wright's residence to Agent Petty. Hatfield advised that Wright kept packaged marijuana in his residence, and Wright weighed each package during each individual transaction.

Hatfield described an encounter he had with Clinton during one of his trips to Kettle Falls. Hatfield recalled that he met Clinton and several of his friends who had a discussion regarding marijuana grow operations in Kettle Falls. Hatfield recalled the men discussed a marijuana grower who had a $1,000 per month power bill for the past 10

ORDER - 3

years. Hatfield recalled observing Clinton smoking marijuana in front of his residence.

Hatfield later provided Agent Petty with Google Earth maps which showed the location of Clinton's residence, Wright's residence, and the location of a suspected marijuana building/bunker.  Agent Petty showed Hatfield aerial surveillance video of the Kettle Falls area.  Hatfield identified Wright and Clinton's residences, as well as the location of a suspected building/bunker.

Agent Petty asked Hatfield about the suspected building/bunker. Hatfield advised that the building/bunker was approximately 10' by 5' and built into the side of a hill[2].  On one occasion when Hatfield traveled to Kettle Falls to purchase marijuana, he and Wright approached the building/bunker.  Hatfield saw Wright enter the building/bunker and then disappear for approximately 10 minutes.  Hatfield observed that the building/bunker appeared to consist of a small room with horse saddles hanging on the back wall.  After approximately 10 minutes, Wright exited the building/bunker with 8-10 marijuana plants. Hatfield believed that there must have been another door which lead to a much larger room because those marijuana plants could not have been located in the small room with the horse saddles.

---

[2]Hatfield originally described the building/bunker as being smaller than these dimensions, but it is unclear whether he may have been describing the entranceway to the bunker.

ORDER - 4

Following his arrest in 2009, Hatfield was asked about the drug ledgers which had been seized from his Yakima residence. Hatfield was specifically asked about the "Clint" and "Wright" entries which had been made in the ledgers. Hatfield advised that "Clint" and "Wright" referred to Clinton Halbert and Wright Halbert. Hatfield explained that each time he purchased marijuana from Wright, that Wright would provide Hatfield with the name of the marijuana strain, i.e., "G-13." Hatfield advised that Wright told him that "G-13" was a new type of strain of marijuana.

Hatfield advised that he only purchased marijuana from Wright but also believed that Wright was selling marijuana on behalf of Clinton. Agent Petty asked Hatfield about a January 31, 2007 entry which had been made in the drug ledger. The January 31, 2007 entry noted "Christmas trees." Hatfield advised that "Christmas trees" was another name for marijuana starter plants.

During his investigation in the days prior to issuance of the warrants, Agent Petty contacted the DEA Spokane Resident Office and obtained historical information. Agent Petty learned that two separate confidential informants had previously provided information concerning a marijuana grow operation in the Kettle Falls area. Agent Petty learned that both informants had been deemed reliable and credible. Agent Petty was also advised by law enforcement that both informants had provided information which lead to the execution of search warrants and/or the arrests of individuals involved in the manufacture and cultivation of marijuana in both Stevens County and Spokane County, Washington.

ORDER - 5

More specifically, Agent Petty learned that on April 8, 2002, Confidential Informant #1 ("CI #1") reported that he/she knew of two marijuana grow operations at the China Bend Vineyard in Stevens County. CI #1 described a marijuana grow operation at the China Bend Vineyard. CI #1 advised that the owner of the business and his surrounding neighbors were also involved in the cultivation of marijuana. CI #1 identified the neighbors as "Clint" and 2 "Right" (sic). CI #1 advised that "Clint" was "Right's" father. CI #1 advised that "Clint" and "Right" both had residences on the property located next to the China Bend Vineyard. CI #1 described "Clint's" residence as a sixty by one hundred foot structure, with yellow metal siding. CI #1 advised that in the summer of 2000, he/she was at this location and could smell the odor of marijuana coming from within the structure at Clinton Halbert's property.

Agent Petty learned that on June 6, 2002, CI #1 directed two law enforcement officers to a location near the driveway of the China Bend Vineyard. At that time, both law enforcement officers detected the odor of marijuana. On December 18, 2002, Confidential Informant #2 ("CI #2") advised that he/she had received information that the owner of the China Bend Vineyard was growing marijuana in underground wine cellars.

Agent Petty conducted a records check of the area surrounding the China Bend Vineyard. Agent Petty learned that Clinton Halbert was associated with three addresses: (1) 3772 Vineyard Way; (2) 3776 Vineyard Way; and (3) 3767 Vineyard Way. Agent Petty also learned that

ORDER - 6

Wright Halbert and Berry Nahani were associated with 3767 Vineyard Way. Each property was listed in/near Kettle Falls, Washington.

On May 20, 2009, Agent Petty sent an administrative subpoena to Avista Utilities ("Avista") regarding meters associated with 3767, 3772, and 3776 Vineyard Way. Agent Petty learned that Clinton Halbert and Christine Delk were the customers/subscribers for the power associated with 3767 Vineyard Way and 3772 Vineyard Way. The billing address for both meters was listed as 3772 Vineyard Way. Agent Petty also learned that there were no meters associated with 3776 Vineyard Way.

The power records from Avista revealed that Clinton Halbert had the power connected to 3767 Vineyard Way on May 4, 1995, and that from May 18, 1995 through September 17, 1998, 3767 Vineyard Way averaged 244 kWh per month. A massive jump in power usage occurred thereafter. The power records documented that from September 16, 1998 through November 12, 2009, the property averaged approximately 2,540 kWh per month, which was a 903 percent increase in monthly power consumption. Agent Petty also noted that there did not appear to be any significant fluctuation in power consumption typically common during the four seasons.

Clinton Halbert had the power connected to 3772 Vineyard Way on June 30, 1999. The meter associated with this property showed an average of 738 kWh per month was used from July 16, 1999 through July 15, 2004. From July 15, 2004 through November 12, 2009, this property incurred an average of electrical usage rate of 1,608 kWh per month, which was a cumulative 541 percent increase compared to the previous four years.

Agent Petty could not find comparable nearby properties with which to conduct a power comparison.

An administrative subpoena to the State of Washington Employment Security Department resulted in receipt of information that from January 1, 1987 through October 26, 2009, Wright Halbert's average gross income (not including unemployment compensation) was $203.00 per month. From January 1, 1987 through October 26, 2009, Clinton Halbert's average gross income (not including unemployment compensation) was $823.89 per month. Christina Delk's average gross income during this same time period (not including employment compensation) was listed as $1.28 per month. Agent Petty then reviewed the power bills associated with 3772 and 3767 Vineyard Way. He found that the two Defendants and Christine Delk appeared to be paying 29 percent of their total combined reported income for power.

**II. DISCUSSION**

The defendants move to suppress all evidence seized from Parcel #2378800. Defendants argue that the search warrant application[3] did not establish probable cause to justify the search because (1) the allegations set forth in the affidavit were stale, (2) the allegations contained material falsehoods and omissions, and (3) the affiant lacked veracity.

///

---

[3] Two separate search warrants were requested and issued.

ORDER - 8

**A. Timeliness of the Factual Allegations in the Search Warrant Affidavit**

Under the "totality of the circumstances" analysis which governs probable cause determinations, "[t]he task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Facts in support of a search warrant affidavit must be "so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time. Whether the proof meets this test must be determined by the circumstances of each case." *United States v. Beltempo*, 675 F.2d 472, 477 (2d Cir. 1982) (*citing Sgro v. United States*, 287 U.S. 206, 210-11, 53 S.Ct. 138, 77 L.Ed. 260 (1932)). "[T]he principal factors in assessing whether or not the supporting facts have become stale are the age of those facts and the nature of the conduct alleged to have violated the law." *United States v. Diaz*, 176 F.3d 52, 109 (2d Cir. 1999) (citations and quotation marks omitted). "Where a supporting affidavit presents a picture of **continuing conduct** as opposed to an isolated instance of wrongdoing ... the passage of time between the last described act and the presentation of the application become[s] less significant." *Id*. "This is especially true in a case involving an ongoing narcotics operation, where intervals of weeks or months between the last described act and the application for a wiretap do not necessarily make the information stale." *Id*. [emphasis added].

ORDER - 9

The first search warrant in this case was issued on November 18, 2009 and a second search warrant was issued on December 7, 2009. The first search warrant affidavit was based, in part, on allegations suggesting that the defendants were involved in a pattern of criminal activity for a period of several months immediately prior to the application for the search warrant but perhaps going back as long as eight years. In preparing his affidavit, Agent Petty considered recent dramatic power usage activity in 2009, information from a reliable cooperating witness who had purchased marijuana and received starter marijuana plants from defendants on or about January 2007, and information from another confidential informant of proven reliability indicating marijuana-related activity on the subject parcel as far back as 2002.

Based on the pattern of conduct alleged in the affidavit and the proximity in time of the evidence seized from Hatfield (drug ledgers in conjunction with Hatfield's arrest in 2009) to the application for the search warrant, the allegations contained were not stale when considered under the totality of allegations and described alleged illegal activity spanning over several years. Those allegations, read together, indicated that there was a fair probability that evidence of illegal drugs would be found at the defendants' respective residences on Vineyard Way and on Parcel #2378800.

///

///

ORDER - 10

**B. Illegal Search of the Curtilage and Affiant's Lack of Veracity**

The defendants' argument is unpersuasive with respect to the alleged illegal search of the curtilage and the affiant's lack of veracity. As to the curtilage issue, Agent Petty and other agents traveled by boat to a public beach[4] on July 17, 2009. Agent Petty and other law enforcement officers then walked onto the Defendant's parcel. The officers walked in a north-east direction. Eventually, the officers reached a dirt/gravel road and proceeded north. The officers observed that there were no fences surrounding the property (except for two circular horse fences), and there were no "no trespass" signs noted. As they walked on the road, Agent Petty observed the outbuilding/bunker. As the officers approached the bunker in the late night hours, they heard music coming from a lean-to type structure directly above the outbuilding[5]. Agent Petty and TFO Hicks approached the lean-to structure and observed the outline of plants and flowers inside. The law enforcement officers observed a "glow" coming from within the lean-to structure. Agent Petty observed large amounts of black plastic pots, starter trays, "Black Gold" potting soil, "Sunshine" potting soil, and regular potting soil. Due to his training and experience, Agent Petty was aware that "Black Gold" and

---

[4] The Stevens County Assessor's Office Map shows that the Defendants do not own most of the land, in which trees are present, directly adjacent to the beach front.

[5] Experience suggests music was commonly used to cover the sounds of fans used to ventilate grow rooms.

ORDER - 11

"Sunshine" potting soil are commonly used in indoor marijuana grows. Agent Petty observed that the bunker was partially buried/flush with the hillside. Agent Petty also observed "Pyrethrum TR" insecticide and was aware that this brand of insecticide is common with in-door marijuana grows. The surveillance operation was terminated at approximately 2:30 a.m.

The Defendants appear to concede that during this time, Agent Petty came no closer than 58 yards from Clinton's residence and no closer than 130 yards from Wright's residence.[6] Agent Petty and other law enforcement officers came onto the 20 plus acre parcel at night and did not see any "No Trespassing" or "Private Drive" signs. The court finds that the area in question, the bunker, is not within the curtilage. The right to privacy does not extend to a person's open fields. *Hester v. United States*, 265 U.S. 57 (1924).

As to Agent Petty's veracity, the court finds defendants' argument without merit and based on another event that is interpreted out of proper context as further explained in the government's briefing filed herein.

**C.  Good Faith Exception**

Even though a warrant is based on insufficient probable cause, the evidence need not be suppressed if an officer relies in good faith on the warrant's validity. *United States v. Mendoza*, 989 F.2d 366 (9 Cir

---

[6]Defendants state that the bunker is 58 yards from Clinton's house and approximately 130 yards from Wright's home.

ORDER - 12

1993)(citing *United States v. Leon*, 468 U.S. 897 (1984)). Although the court finds the affidavit in question provided probable cause to support the issuance of the warrants, assuming arguendo that the affidavit was insufficient, there was enough information provided to allow objectively reasonable officers to rely upon the magistrate judge's determination.

**D.  Frank's Hearing**

A defendant is entitled to an evidentiary hearing on the validity of the affidavit underlying a search warrant if the defendant can make a substantial preliminary showing that (1) the affidavit contains intentionally or recklessly false statements or misleading omissions, and (2) the affidavit cannot support a finding of probable cause without the allegedly false information. *United States v. Reeves*, 210 F.3d 1041, 1044 (9th Cir. 2000). The Defendants have made several allegations of deliberate falsehoods and reckless disregard for the truth[7]. The affidavits in question presented probable cause that evidence of criminal activities would be found on the parcel in question. The magistrate had a substantial basis for concluding that probable cause existed. Moreover, addition of the allegedly omitted information would

---

[7]Among other statements, Hatfield at one point: described the hillside bunker as being smaller than its actual size; stated that one of the defendants (Wright) was selling the marijuana product on behalf of the other (Clinton); that Wright was working on his marijuana operation at night so his father would not find out; and that he (Hatfield) had no direct dealings with Clinton.

ORDER - 13

not have changed the magistrate judge's decision permitting the search to go forward.  Therefore, Defendants' request for a Franks Hearing is respectfully denied.

**IT IS HEREBY ORDERED**:

1. Defendants' joint Motion to Suppress and Request for Frank's Hearing, **Ct. Rec. 89**, filed in NO. CR-09-0172-LRS-1 on May 17, 2010, is **DENIED**.  The court finds:

   (A) Information in the application for search warrants revealed ongoing criminal activity which had occurred over a significant period of time thereby justifying the government's belief that the illicit activities based on the officers' later investigation were ongoing when the warrants were executed in this case.

   (B) The activities preceding execution of the search warrants occurred in an open area not within the curtilage of the residences occupied by any defendant herein.

   (C) The posting of unseen no trespassing and private property signs elsewhere on the property away from the area of entry by the officers did not provide sufficient notice to create an expectation of legal privacy on the part of the defendants herein.

    (D) Supplementation of the applications for search warrant with the additional information suggested by defendants would not have changed the issuing judicial officer's finding of probable cause.

    (E) Under the totality of circumstances present in this case, probable cause supported issuance of the search warrants herein.

**IT IS SO ORDERED.** The District Court Executive is directed to enter this order and to provide copies to all counsel, the U.S. Probation Office, the U.S. Marshal, and the Jury Administrator.

**DATED** this 9th day of June, 2010.

                                      *s/Lonny R. Suko*

                              _____
                                  LONNY R. SUKO
                         Chief United States District Judge

ORDER - 15